**UNITED STATES of America**

**v.**

**Paul CASTELLANO, et al., Defendants.**

**No. SSS 84 Cr. 63 (ADS).**

United States District Court,
S.D. New York.

March 5, 1985.

er than Shargel were present), the government represented that it intended to call Mr. Shargel as a hostile witness. Third, the government argues that the A.B.A.'s Canons of Ethics require Shargel's disqualification, seemingly because Shargel's participation as Mastrangelo's counsel at trial might adversely affect the interests of some of his former clients, and that those clients who are defendants in this case are not in a position to give effective waivers.

■ The Supreme Court's recent decision in *Flanagan v. United States*, 465 U.S. 259, 104 S.Ct. 1051, 1054–57, 79 L.Ed.2d 288 (1984), which held that orders disqualifying trial counsel are not immediately appealable under 28 U.S.C. § 1291 (1982), forces courts to walk a fine line. On the one hand, if counsel is not disqualified, the client may nevertheless later "establish that an actual conflict of interest adversely affected his lawyer's performance," *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980), depriving him of his sixth amendment right to effective assistance of counsel. On the other hand, *Flanagan* forces a defendant whose lawyer is improperly disqualified to undergo trial without the counsel of his choice. A defendant convicted under such circumstances may claim that he too has been deprived of "a right of constitutional dimension"—the ability to pick his own lawyer. *United States v. Cunningham*, 672 F.2d 1064, 1070 (2d Cir. 1982); *see also, e.g., United States v. Bubar*, 567 F.2d 192, 203 n. 18 (2d Cir.) (recognizing defendant's "constitutional right to be represented by *counsel of his own choice*") (emphasis in original), *cert. denied*, 434 U.S. 872, 98 S.Ct. 217, 54 L.Ed.2d 151 (1977); *United States v. Armedo-Sarmiento*, 524 F.2d 591, 592 (2d Cir.1975) (per curiam) (defendant's sixth amendment rights are implicated by motion to disqualify retained counsel). The standard on appeal for claims involving wrongful deprivation of counsel has not yet been established. Nevertheless, the weighty public interest in the finality of any judgment, *see Illinois v. Somerville*, 410 U.S. 458, 463, 93

Rudolph W. Giuliani, U.S. Atty. for S.D.N.Y., New York City (Walter S. Mack, Jr., Mary Lee Warren, Michael Kellogg, New York City, of counsel), for U.S.

Gerald L. Shargel, New York City (Jonathan J. Silbermann, New York City, of counsel), for defendant Richard Mastrangelo.

## OPINION AND ORDER

SOFAER, District Judge:

The government has moved to disqualify Gerald L. Shargel, Esq., from representing defendant Richard Mastrangelo at the trial of this criminal action. The government argues that Shargel must be disqualified for three reasons. First, Shargel invoked his fifth amendment privilege against self-incrimination before a grand jury with respect to his relationships with several of the twenty-four defendants named in the indictment, including Mastrangelo. The government claims that this creates a conflict of interest between Shargel and Mastrangelo, since Shargel might seek to limit his own potential criminal exposure at the expense of zealously representing Mastrangelo. Second, the government claims that Mr. Shargel "should be a witness at the trial." Government Memorandum at 4. It was unclear from the discussion in the affidavits and memorandum filed by the government who exactly was going to call Mr. Shargel, but at a conference on December 19, 1984 (at which defense counsel oth-

S.Ct. 1066, 1070, 35 L.Ed.2d 425 (1973), particularly in a case which the government estimates will take many months to try, militates in favor of great caution in disqualifying Mr. Shargel. Before any such drastic step is taken, the government must show convincingly that no less intrusive measure can adequately protect the interests it has invoked.

### I. *Factual Background.*

In March 1984, Shargel was served with a subpoena duces tecum requiring him to testify before a grand jury and to produce records of any money or property transferred to him by or on behalf of ten individuals, eight of whom are defendants in this case. Shargel moved to quash the subpoena on the ground that disclosure of the information requested would breach the attorney-client privilege. On April 26, 1984, Judge Lasker denied the motion to quash, and his decision was upheld by the Second Circuit. *In re Shargel,* 742 F.2d 61 (2d Cir.1984).

One week later, on August 20, 1984, Shargel appeared before the grand jury pursuant to the subpoena duces tecum. He declined, however, to produce the records or to answer any questions concerning the ten named individuals, and invoked his fifth amendment privilege against self-incrimination. The government challenged Shargel's assertion of the privilege, but Judge Keenan accepted the representation of Shargel's counsel, Edward M. Shaw, Esq., that a valid basis existed for its invocation. Therefore, upon the government's application, Judge Keenan ordered that, if Shargel subsequently invoked the privilege, he must be given immunity before being required to testify. On August 22, Shargel again appeared before the grand jury. When he asserted his fifth amendment privilege, the government activated the immunity order signed by Judge Keenan. The order was amended to grant Shargel retroactive immunity to cover his August 20 appearance. Shargel then testified and produced three documents which he claimed were the only records he

possessed that were responsive to the subpoena. He appeared before the grand jury again on September 5, 1984. He later produced various other bank records.

### II. *Mr. Shargel's Assertion of His Fifth Amendment Privilege.*

The government contends that Shargel's mere assertion of his privilege against self-incrimination before the grand jury creates a conflict of interest between him and his client Mastrangelo that requires his disqualification. It claims that "[b]y invoking the Fifth Amendment privilege, Shargel has admitted that he himself may be involved in some sort of wrongdoing involving his clients." Government Memorandum at 10. This potential criminal exposure, the government contends, may lead Shargel to hold back in his defense of Mastrangelo, minimizing his exposure at the expense of his client's interest in an effective defense.

The government relies on the Second Circuit's decisions in *United States v. Cancilla,* 725 F.2d 867 (2d Cir.1984), and *Solina v. United States,* 709 F.2d 160 (2d Cir.1983), which, it argues, establish a "per se" disqualification requirement in cases where an attorney is implicated in criminal conduct. In *Solina,* the Court of Appeals held that a per se conflict of interest between a defendant and his attorney exists when the attorney was not admitted to the bar. Such an attorney, the Court found, "cannot be wholly free from fear of what might happen if a vigorous defense should lead the prosecutor or the trial judge to inquire into his background and discover his lack of credentials. Yet a criminal defendant is entitled to be represented by someone free from such constraints." 709 F.2d at 164. The Court concluded, "without enthusiasm," *id.* at 169, that when a defendant unknowingly was represented by a person not licensed to practice law harmless-error analysis is inapplicable and "a *per se* rule appears to us to be required," *id.* at 168. In *Cancilla,* the Court was asked to assume for purposes of the appeal that the defendant's trial counsel himself was "involved in criminal activity similar to the charges against Cancilla," in part due to

his "prior and arguably continuing representation" of a person who would be implicated in criminal conduct if the co-defendant's defense were accepted. 725 F.2d at 868. Citing *Solina*, the Court in *Cancilla* "conclud[ed] with a similar lack of enthusiasm" that a per se rule was appropriate:

█t must have occurred to counsel that a vigorous defense might uncover evidence or prompt testimony revealing his own crimes, even more so than in *Solina*.... Moreover, representation of Cancilla in ways other than by a vigorous defense may have been affected. It is difficult to see how counsel conflicted in this way could impartially have given Cancilla advice on whether or not to take a guilty plea, since counsel might have feared that acceptance of a plea would turn on Cancilla's cooperation, which might lead to discovery of the link to counsel's own activities. In such circumstances, proof of this type of conflict, which the government here asks the court to assume, constitutes under *Solina* a per se violation of the Sixth Amendment right to effective assistance of counsel.

*Id.* at 870. The court then noted how *Solina* drew upon *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), which had held that "a defendant who raised no objection at trial must show that an actual conflict of interest adversely affected his lawyer's performance.... [T]he possibility of conflict is insufficient to impugn a criminal conviction." *Id.* at 348, 350, 100 S.Ct. at 1719. The Second Circuit explained:

The Court in *Cuyler* was concerned with the effect of multiple representation, a situation that invariably raises the *possibility* of harmful conflict that often does not exist in fact. *Solina* involved a different type of conflict for a lawyer, which is always real, not simply possible, and which, by its nature, is so threatening as to justify a presumption that the adequacy of representation was affected.

725 F.2d at 870 (emphasis in original).

█ This case, however, differs from both *Solina* and *Cancilla.* First, those cases provide no basis for the government's claim that Shargel's invocation of the privilege against self-incrimination before the grand jury indicates that he is "involved in some sort of wrongdoing." The law in fact provides no support for such an inference:

[N]o implication of guilt [can] be drawn from [a witness'] invocation of his Fifth Amendment privilege before the grand jury. Recent re-examination of the history and meaning of the Fifth Amendment has emphasized anew that one of the basic functions of the privilege is to protect *innocent* men. "Too many, even those who should be better advised, view this privilege as a shelter for wrongdoers. They too readily assume that those who invoke it are either guilty of crime or commit perjury in claiming the privilege." ... "The privilege serves to protect the innocent who might otherwise be ensnared by ambiguous circumstances."

*Grunewald v. United States,* 353 U.S. 391, 421, 77 S.Ct. 963, 982, 1 L.Ed.2d 931 (1957) (citations omitted). An assertion of the privilege is justifiable even though the testimony to be given before a grand jury could not as a matter of law support a criminal conviction; the proper test is whether the answers might "furnis[h] a link in the chain of evidence needed in a prosecution...." *Blau v. United States,* 340 U.S. 159, 161, 71 S.Ct. 223, 224, 95 L.Ed. 170 (1950); *see In re Flanagan,* 533 F.Supp. 957, 963 (E.D.N.Y.) (same), *rev'd on other grounds,* 691 F.2d 116 (2d Cir. 1982); *see also Brink's, Inc. v. City of New York,* 717 F.2d 700, 709 (2d Cir.1983) ("the conditions of grand jury appearances ... are particularly likely to lead innocent witnesses to invoke the privilege"); *Russell v. United States,* 306 F.2d 402, 411–12 (9th Cir.1962) ("The privilege may be claimed by one who is innocent but who reasonably could fear that disclosure of the information would result in criminal charges against which he would have to defend himself.").

■ The government implicitly pressed this point in its December 28, 1984 letter to Judge Keenan, which intimated that Mr. Shargel has misused the privilege because his testimony after Judge Keenan's grant of immunity provided no incriminating information. But Shargel did not claim, and did not have to claim, that he was in fact guilty of any crime to obtain immunity. While "a claimant of the privilege is not immunized from answering a question upon his mere declaration that it would tend to incriminate him—'his say-so does not of itself establish the hazard of incrimination' "—a judge evaluating a claim of privilege may rely upon "his personal perceptions of the peculiarities of the case" as well as upon the evidence. *Camelot Group, Ltd. v. W.A. Krueger Co.*, 486 F.Supp. 1221, 1224–25 (S.D.N.Y.1980) (Weinfeld, J.) (quoting *Hoffman v. United States*, 341 U.S. 479, 486–87, 71 S.Ct. 814, 818–19, 95 L.Ed. 1118 (1951)). *See also United States v. Rodriguez*, 706 F.2d 31, 37 (2d Cir.1983) (requiring particularized showing of potential for incrimination); *United States v. Zappola*, 646 F.2d 48, 52–54 (2d Cir.1981) (same), *cert. denied*, 459 U.S. 866, 103 S.Ct. 145, 74 L.Ed.2d 122 (1982). Shargel's explanation for invoking his privilege against self-incrimination was, in substance, his "fear that an aggressive prosecutor with impaired judgment [might] view ambiguous conduct as criminal." Affidavit of Gerald L. Shargel ¶ 5 (Nov. 30, 1984). In this case, Shargel knew he had represented several people named as members of the same conspiracy and racketeering enterprise, and at least suspected that one of them had become a cooperating witness. Furthermore, as discussed below, he knew he had no records to support his version of any suspicious events or circumstances. This is a sufficient basis for his claim, and for the grant of immunity. The government's apparent failure to grasp the point lends credence to Shargel's wisdom in having relied upon it.

■ The government states that Shargel might not provide Mastrangelo with impartial advice "if, by doing so, Shargel could be implicating himself in unknown criminal offenses or exposing himself to a perjury prosecution." Government Memorandum at 3. The mere possibility that Shargel may have committed some "unknown" criminal offense cannot justify depriving Mastrangelo of his right to the counsel of his choice. In *Cancilla*, the government, as a tactical matter on appeal, asked the court to assume the involvement of counsel in criminal activities, but argued that any such involvement was harmless error. 725 F.2d at 868–69. Here, however, the government cannot ask the court to assume the criminal activity of defense counsel, since that begs the central question. Furthermore, Shargel would have little to fear from any prosecution for "unknown" offenses, since he was granted immunity before the grand jury. The government will face the "heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources" if it seeks to prosecute him for any offense related to his grand jury testimony, other than perjury. *Kastigar v. United States*, 406 U.S. 441, 461–62, 92 S.Ct. 1653, 1665–66, 32 L.Ed.2d 212 (1972); *see Goldberg v. United States*, 472 F.2d 513, 515–16 (2d Cir.1973).

### III. *The Possibility of Prosecution for Perjury or Obstruction of Justice*

The government also advances the more concrete claim that Shargel may be ineffective in assisting Mastrangelo because he may fear future prosecution for perjury stemming from his grand jury testimony, and possibly for obstruction of justice. The government points out, in *ex parte* affidavits and materials, certain apparent inconsistencies between Shargel's grand jury testimony and other evidence potentially available to the government.

During his grand jury testimony, Shargel testified as to his lawyer-client relationships with various defendants and alleged co-conspirators in this case. Shargel also testified about the payments he received from each of his clients. The government claims that two anticipated witnesses ("A" and "B") will testify "that Mr. Shargel's

fees and the amounts paid him were far in excess of the sums reported to the Grand Jury by Mr. Shargel." *Ex parte* Affidavit of Walter S. Mack, Jr. ¶ 3 (Nov. 23, 1984). These witnesses will also allegedly testify that Roy DeMeo several times "paid Shargel large sums of money on account of the legal difficulties of others in the DeMeo crew, in other words, a benefactor description of fee payments which Mr. Shargel has categorically denied to Judge Lasker, the Court of Appeals and to the Grand Jury." *Id.* In particular, the government refers to a transaction that occurred in about October 1981, when DeMeo gave Shargel some cash in a paper bag on a street corner in downtown Manhattan. Shargel confirmed that he did meet with DeMeo in October 1981, near Mulberry and Grand Streets on his way to another meeting. Shargel described the event as follows:

Q. And what did Mr. DeMeo do on that occasion?

A. Other than talk to me, he handed me a paper bag.

Q. Can you describe the paper bag?

A. No. Just an ordinary—not a large one, not a shopping bag. There was a relatively small amount of money in it. The bag was wrapped. It wasn't a big open shopping bag.

Q. What was in the bag?

A. Money.

Q. How much money?

A. I think some $2000.

Q. $2000?

A. Yes.

Q. And, basically, in what type of bills?

A. Well, it struck me, and I seem to recall that there weren't hundred dollar bills, because they were in a paper bag. $2000 in hundred dollar bills is a very small package.

Q. It sure is. What is your recollection?

A. My recollection is that they were smaller denominations, but I can't tell you.

Q. Was there anything else in the bag?

A. No, not that I recall.

Q. What was that money received on account of?

A. Continued legal services in connection with my representation or my lawyer-client consultations with Mr. DeMeo.

Q. And it's your testimony to us that no moneys received on that occasion were on account of or were paid to you for any services rendered or to be rendered to Mr. Dordal, Mr. Gaggi or anyone else?

A. That's right.

Grand Jury Transcript at 65–66 (Aug. 22, 1984). Shargel testified that he had done legal work for Dordal, and that his best recollection of the fee he negotiated with Dordal was $10,000. *Id.* at 12. He said Dordal had actually paid him between $13,000 and $15,000, all of which had been delivered to his office by an unidentified woman in cash installments on several occasions. *Id.* at 14–17. He claimed that he had never received funds from anyone named in the subpoena on Dordal's behalf; that the only money he ever received in a paper bag was from and on behalf of DeMeo; and that he had never received more than $30,000 in cash from anyone named in the subpoena. *Id.* at 43–44, 56, 66.

The grand jury testimony of government witness "A" differs significantly from Shargel's. "A" said that DeMeo had secured Shargel's services in 1981 to help "Paulie" Dordal in his appeal. He then testified as follows with respect to the payment of money by DeMeo to Shargel:

Q. And were you ever present when [Shargel] was paid some money?

A. Yes.

Q. Could you tell the Grand Jury what you recall about that.

A. Well, the sum of money was $150,000.

Q. And how was it paid?

A. It was paid in a bag and Roy [DeMeo] gave him the money by Ferrara's in Manhattan.

Q. Well, you drove him in?

A. Yes....

    \*    \*    \*    \*    \*    \*

Q. And just tell us so that we can know exactly what happened....

    \*    \*    \*    \*    \*    \*

A. And we seen Jerry's car, Shargill, the lawyer. He had a [Jaguar].

Q. What kind of a [Jaguar]?

A. White [Jaguar].

Q. Do you know what kind of a model?

A. No, it was a white [Jaguar], four door.

Q. Where was it?

A. He parked right in front of Ferrara's.

Q. And what happened?

A. Roy handed him a big bag of money.

Q. And did you hear anything said between the two?

A. Well, they were talking about Nino's [Gaggi's] case and they would also talk about Paulie Pinto's [Dordal's] appeal. So, I know it was $150,000. He said, "I just gave him $150,000. Between him and Paulie, they're breaking me."

Q. Now, was Paulie Pinto—did he have a legal case as well?

A. Yes, he had an appeal. Jerry was handling his appeal too.

Q. And that was paid in cash in a paper bag?

A. Yes.

Grand Jury Transcript at 245–46 (Mar. 14, 1984).

Witness B also testified in the grand jury that DeMeo paid Dordal's legal fees on appeal, even though Dordal had gotten into truble doing personal business. "Roy told me it cost him $68,000," the witness said. Grand Jury Transcript at 88 (July 28, 1982). In addition, the government affirms that "A" and "B" have stated at interviews that they will testify that DeMeo on other occasions said he had paid substantial amounts to Shargel for legal fees in behalf of members of DeMeo's alleged "crew," and that Shargel's fees were in fact much higher than Shargel testified. No specific statement by witness "B", other than the July 28, 1982 excerpt, has been submitted to this court.

The possibility that Shargel may be accused of perjury or other criminal conduct is enhanced by his testimony about the manner in which he runs his law practice. In response to the government's subpoena for all records relating to ten persons connected with this indictment, Shargel produced photocopies of stubs from checkbooks for the years 1980 to 1983. These stubs contained figures and dates, but no names. In addition, he produced three other documents. One is a receipt for a shotgun which Shargel received from DeMeo as a present. The others are a deposit slip and a checkbook stub reflecting a check for $2500 which Shargel testified he received as a fee for legal services from Joseph Testa. Shargel said he had no other records relating to his representation of any of the eight persons with whom he admitted having had attorney-client relationships or consultations. He testified that he almost always is paid in cash, and the only record he keeps of his income is the record of the cash and checks he deposits into his bank account. He keeps no record of the amounts of work he does for his clients, or of their payments to him. Occasionally, he said, he makes a notation on a scrap of paper concerning these subjects, but he never keeps these scraps. Grand Jury Transcript at· 30 (Aug. 20, 1984). Indeed, Shargel said he had kept diaries of his appointments and activities, but that he had destroyed these diaries within days of the Supreme Court's decision in *United States v. Doe*, 465 U.S. 605, 104 S.Ct. 1237, 1241–42, 79 L.Ed.2d 552 (1984), which indicated that such diaries could not be protected from disclosure by the privilege against self-incrimination.

This total lack of recordkeeping was intentionally designed to enable Shargel to avoid being called as a witness against any of his clients:

Q. Could you tell us what your reasoning was that caused you to destroy those records?

A. Yes, because I thought the United States Supreme Court had taken a significant departure from earlier established law in holding that as a general proposition—there are exceptions to this, but, as a general proposition, personal records are no longer privileged.

Q. In other words, that you might be forced to disclose those records, those diaries.

A. At some time.

Q. And therefore, what did you do?

A. Destroyed them.

Q. And we are not here sitting in judgment on your personal decisions, but what was your thinking, why, you were concerned?

A. My thinking was concerned for my clients, that I didn't want to be in the position, quite frankly, and with all due respect, that I'm in now. I always believe that the worst position that a defense lawyer could be in is to be called as a witness against his clients. I didn't want information that I regarded as sensitive information to be in a forum where I would be questioned about it, and I destroyed it for that reason.

Grand Jury Transcript at 21–22 (Aug. 22, 1984).

Q. Does your recordkeeping, is it in fact designed to avoid being able to identify the specific source of cash payments?

A. It was specifically designed to avoid me being in the situation I'm in today.

Q. Which is having to specify the dates and sources of cash amounts you received?

A. I don't know if that's what I had in mind, but what I did have in mind is, I didn't want to become a witness against my own clients.

Grand Jury Transcript at 43–44 (Sept. 5, 1984).

Although Shargel may have had no legal duty to preserve a record of his dealings with clients, and while he may have done his clients a favor by failing to keep and by destroying such records, he did not anticipate that his former clients and their alleged associates might become witnesses against him. His lack of documentary proof as to those matters respecting which attorneys routinely keep records—names of clients, amounts paid, and work done—has left him vulnerable to claims that are inconsistent with his undocumented testimony.

The government also claims that evidence exists that might suggest that Shargel could be prosecuted for tampering with a witness, or obstruction of justice. One of the government's prospective witnesses is "expected to testify that, in a 1984 conversation with Mr. Shargel in the Metropolitan Correction Center, New York, New York, ... [the witness] was urged not to cooperate with law enforcement authorities and that all his problems would be taken care of by other defendants." *Ex parte* Affidavit of Walter S. Mack, Jr. ¶ 4 (Nov. 23, 1984). At this point, no such testimony has apparently been given. If the testimony is clear and specific, Shargel could conceivably be prosecuted. He is not immune from prosecution for crimes committed during his participation in such a meeting, since he asserted the attorney-client privilege when asked to testify before the grand jury about what he told the witness. The witness apparently intends to assert his attorney-client privilege, so one can only wonder as to what testimony will actually be developed. Certainly, the witness will not be permitted to testify as to what Shargel told him, and at the same time to prevent Shargel from testifying about the conversation by asserting his attorney-client privilege.

■ The government's evidence and arguments raise genuine issues of fact as to whether Shargel might fear prosecution for perjury or obstruction of justice. This material cannot be evaluated properly at this

time, however, because it has been withheld from Shargel, along with the names of the prospective witnesses. Indeed the government seeks to have this motion to disqualify Shargel decided without revealing any of the expected testimony, and hence without even giving Shargel an opportunity to offer explanations that might diminish or negate the likelihood of any threatened prosecution. Mastrangelo cannot so cavalierly be denied the lawyer of his choice. A hearing is required to permit the court and Shargel to hear the testimony of witnesses "A" and "B" on the relevant issues, after which the court can cross-examine the witnesses and Shargel can testify. Only then will the court be able to evaluate the extent to which Shargel is in meaningful danger of prosecution.

■ Furthermore, the government will be required to show, not only that Shargel faces a realistic danger of future prosecutions, but that the bases for such prosecutions will tend to make Shargel less effective in representing Mastrangelo. In this case, the interests of Shargel and Mastrangelo may be consistent, and Shargel may in fact be led by the alleged dangers he faces to be especially vigorous in Mastrangelo's defense. On the other hand, the dangers that Shargel faces may make him less effective at working out any form of cooperation agreement between Mastrangelo and the government. Any such agreement might increase the risk that Shargel faces. For this reason, among others, Mastrangelo will be permitted to witness the hearing, since he will have to evaluate the extent to which evidence exists that might subject his attorney to a future prosecution. Mastrangelo has a right to conflict-free representation. But this right, though important to any defendant, may be waived, and the defendant is "adequately protected by the determination that his waivers are knowing and intelligent." *United States v. Cunningham*, 672 F.2d at 1073. Mastrangelo may be unable to know the exact contours of the potential conflict engendered by Shargel's possible criminal exposure, but "[d]efendants need not be prescient" for their waiver of conflict-free representation to be effective. *United States v. Curcio*, 680 F.2d 881, 888 (2d Cir.1982). If a defendant's "right to counsel of his choice conflicts with his right to an attorney of undivided loyalty, we think the choice as to which right is to take precedence should be left to [the defendant] and not be dictated by the government." *United States v. Cunningham*, 672 F.2d at 1073; *see also United States v. Armedo-Sarmiento*, 524 F.2d at 592 (defendant is entitled to make knowing and intelligent waiver of sixth amendment right to counsel free of conflict of interest).

■ The government correctly notes the complexity of the potential conflict, but the Court of Appeals has decided that the fact that conflicts of interest may be "insidious," or even "ubiquitous," cannot bar waiver altogether. *See United States v. Cunningham*, 672 F.2d at 1073. *United States v. Curcio* provides guidance in determining whether a defendant's waiver of conflict-free representation is knowing and intelligent. First, the court must inform the defendant "in as much detail as the court's experience and its knowledge of the case will permit," of the substance of the dangers involved. 680 F.2d at 888. Second, the defendant should be accorded "a reasonable time to digest and contemplate the risks posed...." *Id.* at 889. Third, the court should elicit from the defendant a "narrative statement of his understanding" to "asses[s] the level of [the] defendant's comprehension." *Id.* Finally, "the waiver [must] be established by 'clear, unequivocal, and unambiguous language.'" *Id.* (quoting *United States v. Garcia*, 517 F.2d 272, 278 (5th Cir.1975)).

After a complete record has been made concerning the government's contentions in its motion to disqualify Shargel, Mastrangelo must appear again before the court, to have the possible dangers of continued representation by Shargel explained to him in appropriate detail. If his categorical desire to retain Shargel continues, he will have to make a clear, unequivocal, and unambiguous waiver of his right to a lawyer free of

those potential conflicts. If Mastrangelo "reveals that he is aware of and understands the various risks and pitfalls, and that he has the rational capacity to make a decision on the basis of this information, ... we would regard his waiver as knowing and intelligent and allow his choice to 'be honored out of "that respect for the individual which is the lifeblood of the law.'" *United States v. Curcio,* 680 F.2d at 888–89, (quoting *Faretta v. California,* 422 U.S. 806, 834, 95 S.Ct. 2525, 2540–41, 45 L.Ed.2d 562 (1975) and *Illinois v. Allen,* 397 U.S. 337, 350–51, 90 S.Ct. 1057, 1064–65, 25 L.Ed.2d 353 (1970) (Brennan, J., concurring)).

IV. *Shargel's Prior Representation of Other Defendants.*

▇ The government also argues that Shargel should be disqualified because of his prior representation of a number of other persons involved in this case. *See* Government Memorandum at 6–8. The facts presented in the government's affidavits and memorandum are insufficient to justify Shargel's disqualification on this ground, although a complete record on this question will also have to be developed.

▇ First, the government misstates the applicable legal standard in suggesting that "[t]he ABA Canons of Professional Ethics [m]andate Shargel's [d]isqualification." Government Memorandum at 6. "[T]he Code was not intended to provide the rules governing disqualification motions ... [I]t simply 'provide(s) guidance for the courts in determining whether a case would be tainted by the participation of an attorney or a firm.'" *United States v. Uzzi,* 549 F.Supp. 979, 980 n. 1 (S.D.N.Y. 1982) (quoting *Armstrong v. McAlpin,* 625 F.2d 433, 446 n. 26 (2d Cir.1980) (*en banc*), *vacated on other grounds,* 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981)). Moreover, the government's reliance on the standard for disqualification enunciated in civil cases ignores the Court of Appeals' observation in *United States v. Cunningham* that, because civil cases "do not involve the crucial factor of the criminal defendant's Sixth Amendment rights, ...

they are not controlling in [criminal cases]." 672 F.2d at 1072 (quoting *United States v. Armedo-Sarmiento,* 524 F.2d at 593).

▇ The appropriate test in the criminal context is one that "balance[s] the defendant's constitutional right [to counsel of his choice] against the need to preserve the highest ethical standards of professional responsibility." *United States v. Cunningham,* 672 F.2d at 1070. A number of factors are relevant to this calculus: the relative intensity of the attorney's representation of the persons involved, *id.* at 1070–71; whether any of the lawyer's former clients have joined in the disqualification motion, *id.* at 1071, 1073; whether those clients have asserted their attorney-client privilege, *id.* at 1073; *see United States v. Armedo-Sarmiento,* 524 F.2d at 593; and whether the current client is willing to limit his right to cross-examine the former client to avoid disclosure of information obtained during his lawyer's prior attorney-client relationship, *United States v. Cunningham,* 672 F.2d at 1073–74.

In this case, the government "acknowledge[s] the fact of Mr. Shargel's lengthy representation of Mr. Mastrangelo," Government Memorandum at 7, much of it directly connected to issues involved in this case. *See United States v. Mastrangelo,* 561 F.Supp. 1114 (E.D.N.Y.), *aff'd,* 772 F.2d 13 (2d Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 2384, 81 L.Ed.2d 343 (1984); *United States v. Mastrangelo,* 693 F.2d 269 (2d Cir.1982); *United States v. Mastrangelo,* 662 F.2d 946 (2d Cir.1981), *cert. denied,* 456 U.S. 973, 102 S.Ct. 2236, 72 L.Ed.2d 847 (1982); *United States v. Mastrangelo,* 533 F.Supp. 389 (E.D.N.Y.1982). Shargel's representation of several other clients also concerned matters which are subjects covered by this indictment, but in most instances that representation took the form of brief consultations. The government claims that Shargel was "house counsel" to the racketeering enterprise. Government Memorandum at 5. To the extent that this claim rests only on his mere representation of various alleged

racketeers, the Second Circuit has explicitly rejected such an inference:

> The argument that inferences of confidential communications demonstrating a criminal conspiracy may be drawn from the fact that several persons became clients of Mr. Shargel within a certain time period is wholly ephemeral. Seeking legal advice is as much a first step in demonstrating innocence or the non-existence of a problem as it is an admission of guilt. Moreover, the fact that a lawyer has multiple clients in no way implies a connection between them.

*In re Shargel,* 742 F.2d at 63 n. 3. Whether Shargel's activities may make him a necessary or proper witness at the trial is a separate matter, discussed below.

None of Shargel's prior clients has joined in the government's motion to disqualify him. This silence, especially in the face of the government's motion, is entitled to some weight in assessing their interests. In *United States v. Cunningham,* the Court of Appeals found no case "in which an attorney has been disqualified on grounds of conflicting prior representation solely at the behest of a person other than the former client or its privy." 672 F.2d at 1072. To the extent that the former client is "sufficiently unconcerned ... that he does not join in the motion to disqualify ..., the interest of the government in disqualifying the attorney is normally quite weak." *United States v. James,* 708 F.2d 40, 46 (2d Cir.1983). Shargel's duty to his former clients in any event is not one of zealous representation. He is not their attorney in this case and his behavior therefore does not implicate their sixth amendment rights. Thus, for example, the government's rhetorical question—"How does [Shargel] advise Dennis Testa whether or not to surrender and what is in this fugitive defendant's best interest?"— Government Memorandum at 8, lacks significance, since Shargel is not Dennis Testa's lawyer in this case, although he is currently the counsel of record in a state-court matter.

The propriety of Shargel's representing Mastrangelo depends, on the one hand, on the degree to which his effectiveness would be hindered because of his other representations and, on the other, on Mastrangelo's willingness "to make the waiver needed to ensure the protection of [Shargel's former clients'] attorney-client privilege[s]." *United States v. Cunningham,* 672 F.2d at 1073. If Mastrangelo makes a knowing and intelligent waiver—and he will be required to do so if he wishes to continue being represented by Shargel—then Shargel will be able to represent Mastrangelo adequately, even if his performance is circumscribed in a way that another attorney's would not be.

The extent to which Shargel is hindered in his representation of Mastrangelo will depend, initially, on which if any of his former clients refuses to waive the attorney-client privilege. Those of Shargel's former clients who are Mastrangelo's co-defendants may decide to waive their attorney-client privilege to obtain "certain advantages," because, as in the case of joint representation, "[a] common defense often gives strength against a common attack." *Holloway v. Arkansas,* 435 U.S. 475, 482–83, 98 S.Ct. 1173, 1177–78, 35 L.Ed.2d 426 (1978) (quoting *Glasser v. United States,* 315 U.S. 60, 92, 62 S.Ct. 457, 475, 86 L.Ed. 680 (1942) (Frankfurter, J., concurring and dissenting)); *see United States v. Curcio,* 680 F.2d at 886. Mastrangelo's co-defendants, acting in consultation with their present lawyers, may well conclude, especially in light of the likelihood that some division of labor will occur among the twenty or so defense attorneys in the case both before and during trial, that they will benefit from having as experienced and skilled a defense lawyer as Shargel involved in this case. Any former client of Shargel who is called as a witness will be able to insist that Shargel not use information obtained through confidential communications, and the court will "exert every reasonable effort to prevent inadvertent disclosures of confidential information." *United States v. Armedo-Sarmiento,* 524 F.2d at 593.

In his testimony before the grand jury, Shargel asserted the attorney-client privilege on behalf of his former clients, because he had then received no indication that they wished to waive their rights. At this point each former client of Shargel should indicate to the court, *in camera* if necessary, his position on the question of his attorney-client relationship with Shargel, and whether Shargel's participation as Mastrangelo's lawyer could in any way prejudice the former client. Only one former client has thus far indicated an intention not to waive, but this indication must be made concrete and will be given weight only if the privilege has not been waived.

The large number of co-defendants and co-conspirators who have had attorney-client relationships with Shargel is a complication militating in favor of Shargel's disqualification. But the record fails to indicate any prior representation that poses any concrete and identifiable conflict between Shargel's duty to Mastrangelo and his duty to his former clients. The government cites two of Shargel's prior relationships in its papers as perhaps the most significant: his representation of Dordal in a formal proceeding concerning the subject matter of act of racketeering thirty-eight; and of Gaggi in an appeal concerning the subject matter of acts of racketeering thirty-two and thirty-five. Mastrangelo is not named in connection with either of these matters, however, so Shargel's involvement in them may in fact have no adverse effect on his current representation. Assuming that Shargel will be unable to question a particular government witness, because he was a former client, Mastrangelo may regard this limitation as unimportant, since the presence of about twenty other defense attorneys will tend to ensure that no legitimate line of inquiry will be neglected.

### V. Shargel's Potential Appearance as a Witness.

The government has now made clear its intention to call Shargel as a witness; Judith Hellman's intention to call Shargel has also been communicated to the court. In addition, Shargel may well be an appropriate witness for Mastrangelo and other defendants to call, to rebut the testimony of a government witness who is expected to testify that Shargel attempted to convince him not to cooperate with the government. These possibilities raise serious questions which may in themselves require Shargel's disqualification. The law requires that a lawyer withdraw from the conduct of a trial if he "learns or it is obvious that he ... ought to be called as a witness on behalf of his client...." N.Y. Jud.L.Code of Professional Responsibility DR 5–102(A) (McKinney 1975). Here, too, however, a complete record must be made as to the matters on which Shargel "ought" to be a witness, the need for his testimony, and, to the extent relevant, the willingness of his client or others to do without his testimony.

The government argues that Shargel's account of Roy DeMeo's visit two days before DeMeo's disappearance "will be of importance in resolving who participated in the murder," Government Memorandum at 4; that his testimony will be relevant to the claim that Shargel "received very large sums of cash from the leaders of the enterprise so as to assure legal representation for certain of its members and ... to shore up the defenses if a member was perceived as weak or likely to cooperate with law enforcement authorities," *id.*; and that his "testimony and credibility will be relevant to Gaggi's tax liability, the enterprise's access to large sums of unexplained cash and his employment as 'house counsel' to preserve the membership," *id.* at 5.

The government's argument is presented in such broad and conclusory terms that one cannot fully assess whether Shargel "ought" to be a witness for the government. Shargel's testimony to the grand jury certainly does not suggest he will give testimony favorable to the government. His account of his meeting with Roy DeMeo indicates that he has no knowledge that is relevant to DeMeo's murder. He has denied having had any client whose fees were paid by a "benefactor" (other than one payment by Joseph Testa on be-

half of his brother Dennis). He repeatedly asserted, and will likely continue to assert, the attorney-client privilege with respect to legal discussions he had with his former and current clients. The rules against counsel appearing as a witness "w[ere] not designed to permit a lawyer to call opposing counsel as a witness and thereby disqualify him as counsel." *Rice v. Baron*, 456 F.Supp. 1361, 1370 (S.D.N.Y.1978). *See* Lowenthal, *Successive Representation by Criminal Lawyers*, 93 Yale L.J. 1, 55 (1983). On the other hand, the testimony available to the government may establish a strong case for calling Shargel as an adverse witness. Shargel may provide useful evidence, even if he contests the truth of the testimony of government witnesses, and his lack of any supporting records may itself be valuable evidence for the government.

The government is correct that Shargel cannot be permitted to cross-examine witnesses concerning events in which he is alleged to have participated, since in doing so "he would place himself in the position of an unsworn witness and implicitly put his own credibility at issue." *United States v. McKeon*, 738 F.2d 26, 35 (2d Cir. 1984). But in this case Shargel may not be placed in such a situation. First, to the extent that these events concern Shargel's clients, a legitimate assertion of the attorney-client privilege by those clients would prevent him from inquiring into privileged events. Furthermore, the government has never contended that Mastrangelo was in any way involved with the murder of Roy DeMeo, the payment of fees involving other clients, or Gaggi's tax liability, so no compelling reason exists for Shargel, as Mastrangelo's counsel, to pursue these matters at trial.

One concrete claim of a need for Shargel's testimony has been made by Judith Hellman. She indicates that Shargel prepared her as a witness at a hearing when he represented Gaggi in connection with the acts alleged in acts of racketeering 32–35. She testified at a post-trial hearing in *People v. Gaggi* that another juror on the jury that had convicted Gaggi had had

an affair with a marshal, and that the marshal's anti-defendant views had been communicated to the jury. She claims that Shargel told her at the time that other jurors had indicated they would testify to the same facts as those to which Hellman ultimately testified, and that Shargel in other ways encouraged her to testify in Gaggi's behalf. This need for Shargel's testimony must be examined further, unless the charges against the Hellmans. are severed from the other claims in the case.

The most likely basis upon which Shargel's testimony could be appropriate is as a rebuttal to the government's attempt to prove that he has acted as "house counsel" for the enterprise alleged in the indictment. The government plans, not only to prove that Shargel represented some ten members of the DeMeo "crew," but also that he received large amounts of cash from DeMeo for his work, that DeMeo paid the fees of at least some of his crew members, and that Shargel also sought to keep at least one member of the alleged crew from cooperating. If the government is able to place before the court sufficient evidence of Shargel's activities for members of DeMeo's crew to warrant treating his common representation of crew members as evidence of their mutual association, then Shargel will be a potentially important witness for Mastrangelo and for other defendants, since he seems certain to controvert aspects of the available testimony about his role. An attorney's obligation to testify for a client extends to former as well as ongoing clients, so Shargel may have a duty to testify, unless all his former clients expressly waive the right to call him. A full record will have to be made on this aspect of the motion.

*United States v. Cunningham* states that a defendant's "right to be represented by counsel of his own choice is too important to be denied on the basis of a mere, though substantial, possibility [that his lawyer will be a witness]." 672 F.2d at 1075. The court recognizes the government's interest in avoiding premature disclosure of its trial strategy. But it must

sacrifice some secrecy before it can demand that Mastrangelo sacrifice his constitutional right to counsel of his choice. In addition to developing the facts described above, the government must provide Shargel, *in camera* and under an appropriate protective order, if necessary, with the opportunity to show that contradictory evidence concerning the matters on which the government (or others) intend to call him would be inadmissible at trial. In addition, Shargel is entitled to a fair opportunity to enter into stipulations concerning any facts for the proof of which the government or others require his testimony. He has already expressed his willingness to stipulate to certain of these facts. *See* Defendant's Memorandum at 10. Stipulations may enable Shargel to continue as Mastrangelo's counsel, since "uncontested" testimony does not require withdrawal. *Cf.* N.Y.Jud. L.Code of Professional Responsibility DR 5–101(B)(1) (McKinney 1975). Disqualification of counsel should be a measure of last resort in a criminal case, and may only be utilized when less serious measures cannot be used to dispose of the problems at issue.

## VI. *Conclusion.*

The government's motion to disqualify Shargel will be decided after an adequate record is made with respect to: (1) the possibility that Shargel may be prosecuted for perjury or obstruction of justice; (2) the possibility that Shargel ought to be a witness for the government, Mastrangelo, or any of his former clients; (3) the extent to which Shargel's former clients object to his representation of Mastrangelo, or intend to invoke the attorney-client privilege; and (4) Mastrangelo's willingness to make a clear and knowing waiver of his right to conflict-free representation. At Shargel's request, both his client and James LaRossa, Esq., lead counsel of the defense side and counsel to Paul Castellano, will be permitted to hear the testimony of informant "A" and such other testimony as the government chooses to place before the court. All three are hereby ordered to reveal to no one any information or identities they learn at the hearing. At the government's request, the court will conduct any questioning it considers desirable, after consulting with Messrs. Shargel and LaRossa.

This opinion will remain sealed until further order of this court. It will be disclosed only to the government's attorneys and to Messrs. Shargel, Silbermann, and LaRossa, all of whom are ordered not to disclose the opinion's contents to any person.

SO ORDERED.