UNITED STATES of America,

v.

James LOFTEN et al., Defendants.

No. 80 Cr. 729 (GLG).

United States District Court, S. D. New York.

Feb. 4, 1981.

John S. Martin, Jr., U. S. Atty., S. D. N. Y., New York City, for plaintiff; James Moss, Asst. U. S. Atty., Chief, Narcotics Div., New York City, of counsel.

Alvin Geller, Irving Cohen, and Jeffrey C. Hoffman, Hoffman, Pollok & Gasthalter, New York City, for defendant James Loften.

## MEMORANDUM DECISION

GOETTEL, District Judge.

Defendant James Loften has moved for an order suppressing certain recorded telephone conversations between his counsel and himself. Most of these conversations were with Alvin Geller, an attorney who initially represented Mr. Loften in these criminal proceedings. (Subsequent to this motion being heard, two other attorneys, or firms, have indicated that they are representing Mr. Loften.) Two calls were with an associate of the firm of Geller and Cohen, James Moriarty. In these calls, Mr. Loften was attempting to reach Mr. Geller or a Mr. Socolov.[1] There is nothing of significance in these phone calls that is not also apparent from the conversations with Geller and it does not presently appear that the Government is intending to offer the Moriarty conversations. Consequently, we will concentrate on the Geller/Loften discussions.

Pursuant to a court-ordered wire tap, the Drug Enforcement Administration ("DEA") intercepted telephone conversations on two telephone numbers at the residence of James Loften in New Rochelle, New York. The wire taps were in effect from September 19, to October 31, 1980, when Loften was arrested. In its application for these wire tap orders, the probable cause included the fact that pen-register devices previously installed on Loften's phone indicated nu-

---

1. The motion assumes that conversations were overheard between only two attorneys and the defendant. In fact, the tapes contain conversations with a third attorney, Albert Socolov. His relationship to this defendant is not apparent. He does not appear to be a member or associate of the firm of attorneys making this motion whose conversations were overheard. However, he apparently works out of the same suite of offices.

merous calls between him and known drug traffickers including attorney Alvin Geller. The Government contends that, as a result of these taps, they obtained a substantial insight into the continuing nature of Loften's criminal enterprises, the identity of his associates, the manner in which they carried out their heroin traffic, and the steps taken by Loften and his associates to avoid detection by law enforcement officers. The taps led to the arrests and indictment of the defendants in this action and the seizure of twenty pounds of heroin and other narcotics paraphernalia.

The telephone calls in question occurred on October 24 and October 31, 1980.[2] On each of those dates, there were eighteen recorded conversations (including a total of nine between Geller and Loften), all of which were triggered by the arrest of alleged associates of Loften. (The Court has listened to all of these conversations, since it was necessary, in order to understand the transactions with Geller, to follow the interspersed calls with other Loften associates.)

On the afternoon of October 24, 1980, a federal search warrant was executed at the Harlem Variety Store on Adam Clayton Powell Boulevard in Manhattan. Five individuals, including James Jones (a/k/a "Crooks"), were arrested during the search. They were later released without the filing of formal charges. (Jones is a co-defendant in this indictment and is presently a fugitive.) The Government contends that the Harlem Variety Store, in addition to being a numbers bank, was a center for Loften's heroin distribution. The search and arrest on that day resulted in a number of phone conversations in which Loften attempted to find out what had happened. From the first conversation it appears that attorney Geller was already aware of the search and arrest and that he was "taking care of it." Geller was then of the belief that the arrest had been made by New York City policemen and he assured Loften that "I got it all under control." Reference was also made to an apparently unrelated matter in which

Geller told Loften that "I saw the man yesterday." In the next conversation, an hour later, Geller advised Loften that he was having difficulty finding the arrested men. But then, in the next call, he advised Loften that they had been arrested by the DEA. In fact, Geller had called a DEA agent to advise him that he was representing Jones.

Contemporaneous with these discussions, Loften spoke on the phone with several of his associates relaying the information that he had received from Geller. Virtually every matter discussed by Geller and Loften concerning the arrests was repeated by Loften to other interested persons. In their fourth phone call that evening, Geller and Loften arranged to meet later in the evening. In their fifth phone call, Geller advised Loften that Jones had been released and that he had spoken to him at home (apparently by telephone). Geller assured Loften that they found nothing, and that he was going to see Jones to examine the warrant and to find out what happened. They agreed to talk later that evening. Apparently, a further conversation took place the following morning but was not recorded due to a power failure.

On October 30, 1980, two other associates of Loften, Robert Goodwin and Furman Starr, were arrested at approximately 6:00 P.M., at the Port Authority Bus Terminal in Manhattan, while boarding a bus for Detroit with one-half kilogram of heroin in their possession. They were not arraigned until the following afternoon. At that time, Loften made his calls attempting to reach either Geller or Socolov and to obtain legal representation for Goodwin and Starr, and spoke with James Moriarty. At a little after 1:00 o'clock, Geller called Loften to say: "We're on top of it. We'll be there. I'll let you know what happens. You know these fellows?" Loften told him that he did. A couple of hours later, Geller called Loften again and started out by saying: "I spoke to our people; they're alright. In-

2. There was apparently an additional call between Loften and Geller intercepted on October 25, 1980 which was not recorded due to a power failure.

volves about half a dozen apples."[3]  Loften inquired as to what bail could be expected and Geller gave his estimate.  Loften then asked whether Geller was going to stop and talk to him.  Geller responded: "Tonight?  Yeah, I'll stop and talk to you tonight.  Either that or do you want to let 'em lay a little bit?"  Loften responded: "No.  Uh, uh.  In other words, somebody can come meet you?"  Geller replied: "Somebody can meet me.  I want to do it tonight and do it right."  This, and similar remarks between Geller and Loften, indicate that they had some form of business dealings not related to legal advice.

That evening, Geller called Loften again advising him that: "We've got a real headache with this one.  Bail on each one is $100,000."  Geller then advised Loften that the same narcotics agent was involved as in the arrest of Jones, commenting: "So there's got to be somebody right in the middle of the whole thing.  You know what I mean?"  Again, Geller arranged to meet with Loften, this time at the Skyline Motel in Manhattan, room 745, in about an hour, Geller informing Loften that he would be there the whole night.  A further conversation took place between them, the import of which is not entirely clear, but which has some ominous overtones.[4]  An hour and a half later, Geller called Loften again and tersely directed him to leave his house immediately and to come to the hotel "and bring some money right now.  Quick!"  Loften agreed to this.  He was arrested at the motel room in the presence of Geller, along with Roy Harris, allegedly his principal lieutenant with whom he had a number

of recorded telephone conversations on the dates in question, relaying information received from Geller.

Defendant seeks to suppress these conversations contending that Geller is an attorney and that his conversations were made in connection with Geller's representation of him and in the belief that the conversations were privileged.  Defendant also argues that it was improper in the first instance for the Government agents to listen to the conversations at all, unless they had probable cause to believe that the attorney was violating the law.

On its part, the Government argues that there has been inadequate *prima facie* proof of the existence of an attorney/client relationship,[5] that in any event Geller was not rendering legal advice, and that to the extent any legal services were performed they were for persons other than Loften.  Moreover, the Government contends that any privilege involved in the conversations was waived by Loften's disclosing them to others in his group and that, in any event, all of these conversations were intended to assist the conspiracy in avoiding detection and in the commission of ongoing crimes, and would, consequently, not be privileged.

■ With respect to the somewhat novel argument that it is *prima facie* improper to even listen to conversations between an attorney and another person, unless there is probable cause for believing that the attorney is committing illegal acts, no persuasive authority for this proposition has been cited.[6]  Moreover, the short answer is that the

---

3.  Some of the conversations between Geller and Loften appear to be in a jargon or code.  Since Goodwin and Starr were arrested with half a kilogram of heroin, it would appear that the phrase "half a dozen apples" refers to it.

4.  Loften:  Now listen, you know, you figure you can arrange that some tight way?
Geller:  I could, at that number?
Loften:  No, I'm talking about, you know, like to get th—
Geller:  I know, I know, I know.  It'll take about . . .  Why don't you and I talk later.  It can be handled.  They're alright.
Loften:  And they'll drop 'em?  They'll drop that?

Geller:  Yeah. I believe so.
Loften:  Oh, OK.
Geller:  That might take eight or nine days.
Loften:  Eight or nine days?
Geller:  Yeah.  I explained it to the fellows.  They understand.
Loften:  They understand?
Geller:  We're gonna take it to, yeah they understand.

5.  The Court does not reach this issue.

6.  While there is some authority for this proposition in several state statutes, *see, e. g.*, Conn. Gen.Stat.Ann. § 54–41h (Supp.1980); Del.Code Ann. tit. 11, § 1336(j) (1974); R.I.Gen.Laws

Government *had* such a suspicion. Indeed, as mentioned earlier, the Government obtained its wire tap authorization on the claim, *inter alia*, that Geller was a suspected narcotics dealer.

■ With respect to the more general claim that Loften's conversations with Geller, an attorney, are privileged, we note initially that the fact that a person is an attorney does not render privileged everything he says or does, for or with a client. *United States v. Bartone*, 400 F.2d 459, 461 (6th Cir. 1968), *cert. denied*, 393 U.S. 1027, 89 S.Ct. 631, 21 L.Ed.2d 571 (1969); *see United States v. Stern*, 511 F.2d 1364 (2d Cir.), *cert. denied*, 423 U.S. 829, 96 S.Ct. 47, 46 L.Ed.2d 46 (1975). Our review of the conversations indicates that very little in the nature of legal representation was involved, except for the requests to have Geller represent members of the alleged conspiracy who had been arrested.

■ The conversations between Geller and Loften imply a dual relationship, one of which did not involve Geller's practice of law. Assuming that Loften and associates *were* engaged in a legitimate activity, most of what Geller did amounted to giving business advice, and, consequently, is not privileged. *United States v. Rosenstein*, 474 F.2d 705, 714 (2d Cir. 1973) (business participant); *Colton v. United States*, 306 F.2d 633, 638 (2d Cir. 1962), *cert. denied*, 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963); *Lowy v. Commissioner of Internal Revenue*, 262 F.2d 809 (2d Cir. 1959) (business adviser). To the extent that Geller transmitted information from the assorted persons to Loften, no privilege would normally attach. *United States v. Tellier*, 255 F.2d 441, 447 (2d Cir.), *cert. denied*, 358 U.S. 821, 79 S.Ct. 33, 3 L.Ed.2d 62 (1958). Moreover, from Loften's standpoint, if one assumes that he was not involved in a narcotics operation, then he personally had no reasonable grounds for needing legal advice concerning the status of the arrests of Jones, Starr and Goodwin.

Ann. § 12–5.1–4(c) (Supp.1978), there does not appear to be any authority under federal law.

■ Of course, it is possible for an attorney to represent an organization and, in so doing, deal with a number of its members under a communal privilege. *See Upjohn Company v. United States*, —— U.S. ——, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). In such instances, however, the activities of the organization are presumably legal. There does not appear to be any authority for the proposition that an attorney representing a criminal syndicate has the ability to deal with various of its members and to claim a blanket privilege for all the communications as being the attorney for the syndicate. Indeed, if Loften and his associates were all co-conspirators in a heroin ring, then the purpose of having Geller obtain information about the others would be to protect and further the operation of the criminal syndicate. It is elementary that conversations which would otherwise be privileged are not if they were made for the purpose of committing a crime. *See Clark v. United States*, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1933); *In re Grand Jury Proceedings*, 604 F.2d 798 (3d Cir. 1979); *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357 (D.Mass.1950); *see generally* C. McCormick, Law of Evidence § 95 (2d ed. 1972). A communication designed to enable or assist a client or an attorney in the commission of a crime or with respect to a continuing crime or fraud is not privileged. *Clark v. United States, supra* 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993; *United States v. Friedman*, 445 F.2d 1076 (9th Cir.), *cert. denied sub. nom. Jacobs v. United States*, 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971); *Matter of Doe*, 551 F.2d 899, 901 (2d Cir. 1977); *United States v. Rosenstein, supra*, 474 F.2d 705, 715; *United States v. Silverman*, 430 F.2d 106 (2d Cir. 1970), *cert. denied*, 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971); *United States v. Bob*, 106 F.2d 37 (2d Cir.), *cert. denied*, 308 U.S. 589, 60 S.Ct. 115, 84 L.Ed. 493 (1939).

■ Since these conversations appear to have as their purpose the furthering of a

*See* J. Carr, The Law of Electronic Surveillance § 5.05 (1977).

criminal enterprise, and were repeated and discussed with other members of the ring, to the limited extent that they may have involved attorney client matters, their privilege was lost. Defendant's motion is, therefore, denied in all respects.

SO ORDERED.