UNITED STATES of America, Plaintiff,

v.

John GOTTI, et al., Defendants.

No. CR–90–1051.

United States District Court,
E.D. New York.

July 19, 1991.

---

John Gleeson, Asst. U.S. Atty., Brooklyn, N.Y., for plaintiff.

Bruce Cutler, New York City, for Gotti.

David Greenfield, New York City, for Locascio.

Gerald Shargel, New York City, for Gravano.

Michael Rosen, New York City, for Gambino.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

The defendants have moved this court for an order that would:

1. Suppress, on a variety of grounds, the fruits of electronic surveillance conducted at the Ravenite Social Club, 247 Mulberry Street, New York, New York, pursuant to an order initially entered by a judge of the United States District Court for the Southern District of New York on September 25, 1989 ("the Ravenite tapes");

2. Suppress, on a variety of grounds, the fruits of electronic surveillance conducted at the Bergen Hunt and Fish Club in 1985 and 1986 ("the BH & FC tapes");

3. Direct that a hearing be held to determine whether the tape recordings of the intercepted conversations are audible;

4. Direct that a hearing be held, pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), on the ground that the order authorizing electronic surveillance was issued in reliance upon statements in a supporting affidavit which were intentionally or recklessly false when made; and

5. Direct that they be granted such other relief as may be just and proper.

## THE RAVENITE TAPES

The Ravenite tapes were created following the issuance of two orders, signed on the 25th day of September, 1989, by Judge Duffy of the United States District Court for the Southern District of New York. Those orders authorized the interception of oral communications and visual, non-verbal conduct at specified locations in and about the Ravenite Social Club, 247 Mulberry Street, New York, New York and at Scorpio Marketing, 229 West 36th Street, New York, New York. The legal justification proffered for the issuance of those orders was contained in an affidavit of George D. Gabriel, an Agent of the Federal Bureau of Investigation ("FBI") who, for the preceding four years was assigned exclusively to cases involving organized crime in the New York area. Agent Gabriel's supporting affidavit presented for consideration by the court: (1) communications intercepted pursuant to court orders between February and September 1988 and his interpretation of those communications; (2) information furnished by nine confidential informants each of whom had provided reliable information over a number of years which was never proven to be false; (3) physical surveillance conducted over a period of many months by Special Agents of the FBI; (4) efforts by the subjects of the order applied for to frustrate prior attempts to electronically intercept their communications. That affidavit, in addition, detailed the reasons for which normal investigative techniques have failed in the past and were reasonably likely to fail in the future. Having issued the orders, it follows that the judge was satisfied that the affidavit and the application accompanying that affidavit satisfied all the requirements of 18 U.S.C. § 2510 *et seq.* and furnished the requisite probable cause.

### I. The *Franks v. Delaware* Motion

The defendants contend that the affidavit of Agent Gabriel upon which the electronic surveillance order was granted contained statements which were intentionally or recklessly falsely made.

### A. *Substantial Showing*

■ *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) teaches that if a defendant makes a substantial preliminary showing that (1) the affidavit upon which a search warrant was granted contained false statements made knowingly and intentionally or with a reckless disregard for the truth, and (2) if the allegedly false statement is necessary for the finding of probable cause, then the Fourth Amendment requires that a hearing be held at the request of the defendant. If the allegation of perjury or reckless disregard is established by the defendant at the hearing by a preponderance of the evidence and, with the false material set aside, the remainder of the affidavit is insufficient to establish probable cause, then the search warrant must be annulled and the yield of the search excluded as if probable cause were lacking on the face of the affidavit. The Supreme Court was careful to exclude from the embrace of the rule statements which were the results of police negligence in checking or recording facts relevant to a probable cause determination to avoid the misuse of the hearing for purposes of discovery or obstruction. The Court was also careful to explain what was meant by a "substantial preliminary showing." It said:

> There is ... a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, *and those allegations must be accompanied by an offer of proof.* They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. *Affidavits or sworn or otherwise reliable statements of witnesses should be furnished,* or their *absence satisfactorily explained.... The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the*

*affiant, not of any nongovernmental informant.*

438 U.S. at 171, 98 S.Ct. at 2684 (emphasis added). If all those requirements are met, and if setting aside the material that is the subject of the alleged falsity or reckless disregard, there remain sufficient content in the warrant affidavit to support a finding of probable cause, then no hearing is required. Only if the remaining content is insufficient is the defendant entitled to a hearing.

■ At the outset it should be noted that although *Franks* involved the validity of a search warrant, its teaching is equally applicable to electronic surveillance orders. *United States v. Biaggi*, 853 F.2d 89, 95 (2d Cir.1988), *cert. denied*, 489 U.S. 1052, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989).

■ In the present case defendants have submitted no "[a]ffidavits or sworn or otherwise reliable statements of witnesses" specifically identifying the portion of the Gabriel affidavit that is claimed to be deliberately false or made with a reckless disregard for the truth, nor is the absence of an affidavit or reliable statement otherwise explained. An affirmation of counsel accompanying the notice of motion, contains the following starkly simple sentence: "The facts contained in the memorandum are accurate to the best of my knowledge and belief." The defendants have failed to cross the threshold requirements of *Franks*. The "belief" of counsel is not enough. To entertain it as though it were would require a hearing in every case in which counsel affirmed his "belief" that a supporting affidavit was false; would, without more, render virtually meaningless the presumption that the supporting affidavit is valid; and would fulfill the desire of defense counsel to cross-examine the affiant. There does not exist the faintest suggestion in *Franks* that a request for a hearing should, in such case, be seriously entertained. On the contrary, the Court was explicit in holding that it should not be. The defendants' motion in this regard may properly be, and hereby is, for that reason summarily denied.

### B. *Falsity*

This aspect of the defendants' motion may be denied, however, for other cogent reasons even if I were inclined to entertain it notwithstanding its fatal deficiency. A critical analysis of their assertions compels that conclusion when tested against the first prong of *Franks*, namely, whether there is a substantial preliminary showing that Agent Gabriel made false statements knowingly and intentionally or with a reckless disregard for the truth. An examination of the defendants' assertions follows:

1. The Reliability of the Government's Factual Representations in Support of the Surveillance Orders is Substantially Undermined by the Abject Failure of the Several Prior Orders.

The essence of this contention is that despite the issuance and execution of eight prior electronic surveillance orders which were extended twenty-three times, the evidence thus obtained did not contribute to the successful prosecution of John Gotti. This contention is, at the very least, patently disingenuous and is summarily rejected. *See Jones v. United States*, 362 U.S. 257, 270, 80 S.Ct. 725, 735, 4 L.Ed.2d 697 (1960).

2. The Conclusions Drawn from the 1988 Electronic Surveillance at the Ravenite Social Club, and Contained in the September, 1989 Application, Were Made in Reckless Disregard for the Truth.

The caption set out above, introducing this section of the defendants' memorandum, bespeaks in part, the inherent infirmity of their *Franks* attack on Agent Gabriel's affidavit. It is one thing to say that an affiant falsely or recklessly stated facts from which he thereafter drew conclusions. It is quite another thing to say that the conclusions drawn from facts fairly stated were falsely and recklessly made. In the latter case, that is nothing more than to say that the defendants and Agent Gabriel disagree on the interpretation of what was overheard on the Ravenite tapes. The defendants' quarrel with Agent Gabriel's *conclusions* can be found repeatedly on pages 12–34 of their memorandum. As has already been noted, entirely absent is any

affidavit, sworn, or otherwise reliable, statement challenging the accuracy of the facts upon which Agent Gabriel based his conclusions.

The defendants' alternative assertion is that the facts gleaned from the Ravenite tapes upon which Agent Gabriel's conclusions were based were false, an exercise in creative writing by Agent Gabriel because the tapes were entirely inaudible. This assertion is in large measure inconsistent with their prior assertion and is unpersuasive for that and other reasons. There is a significant difference between pleading alternative theories of law based upon given facts and pleading alternative statements of fact to support a given principle of law. By that I mean, if the tapes were entirely inaudible and Agent Gabriel's affidavit failed to reveal that fact but nonetheless set out conversations which, by implication, he swore he heard, then clearly the first prong of *Franks* would be met. But the defendants cannot argue that the tapes were inaudible and also argue that they disagree with Agent Gabriel's conclusions based upon what he heard. This argument clearly implies that the tapes were audible, each party heard conversations that were captured on them but disagree about what they heard. Pleading in the alternative is an expedient which, like many expedients, can be carried too far.

The fact that the tapes were not models of acoustical excellence was not concealed by Agent Gabriel. His affidavit makes repeated reference to their audibility deficiencies. The claim cannot be made that Agent Gabriel falsified in that respect and the defendants do not make it. Judge Duffy could have required Agent Gabriel "to furnish additional testimony or documentary evidence in support of [his] application." 18 U.S.C. § 2518(2). That he required neither justifies the inference that he found that the conclusions drawn by Agent Gabriel from the intercepted conversations he swore he heard were justifiable or that he found sufficient probable cause with the affidavit as a whole, excluding some or all of those conclusions, or both.

The defendants fail in two respects to satisfy the first prong of *Franks:* (1) they furnish no affidavits or sworn or otherwise reliable statements of witnesses specifically identifying the portion of Agent Gabriel's affidavit they claim to be deliberately false or made with reckless disregard for the truth and fail to explain the absence of such documents, and (2) they fail to identify, by their own analysis, any statement in the Gabriel affidavit that is false. At best, they have succeeded in making it plain that they disagree with the conclusions drawn by Agent Gabriel from intercepted conversations which he repeatedly and candidly informed Judge Duffy were not captured in stereophonic sound.

### C. *Probable Cause*

■ Ignoring my own observation that pleading in the alternative is an expedient that may be carried too far, I shall consider the second prong of *Franks* assuming, only for this purpose, that the first prong was satisfied. The second prong requires a substantial preliminary showing by the defendants that the allegedly false or reckless statements were indispensable to a finding of probable cause. Put differently, the court must consider whether there was a sufficient basis in the remainder of the Gabriel affidavit upon which a neutral and detached magistrate could reasonably make a finding of probable cause. I hold that there was and the defendants' *Franks* motion must be denied for this reason as well.

The defendants attack that portion of Agent Gabriel's affidavit which informs the court of the information obtained from nine confidential informants. They assert that Agent Gabriel's reliance upon those informants was misplaced; that the information the informants provided was dated; and that the information "reflected 'facts' which were commonly available." (Def. Mem. at p. 35.) Even a casual reading of the defendants' memorandum at pages 35–38 would reveal that the burden of their attack is upon the reliability of the informants, echoing without citing them, the distant voices of *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964)

and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Even a similarly casual reading of *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) would have revealed that those voices have been stilled:

> [W]e conclude that it is wiser to abandon the "two-pronged test" established by our decisions in *Aguilar* and *Spinelli*. In its place we reaffirm the totality-of-the-circumstances analysis that traditionally has informed probable cause determinations.
>
> ... The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that ... evidence of a crime will be found in a particular place.

462 U.S. at 238, 103 S.Ct. at 2332.

Before considering whether a "totality-of-the-circumstances analysis" would support a finding of probable cause based solely upon the information supplied by the nine confidential informants, a restatement of the law as to the roles of the issuing magistrate and of the reviewing court and the law pertaining to the standard by which probable cause is to be measured may be useful. *Illinois v. Gates* succinctly states the controlling principles. The role of this court is "simply to ensure that the magistrate had a 'substantial basis for ... concluding' that probable cause existed." *Id.* at 238–39, 103 S.Ct. at 2332 (citing *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)). It is important to remember in this regard that the Court has also "repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's 'determination of probable cause should be paid great deference by reviewing courts'" which should interpret affidavits in a common sense rather than in a hypertechnical manner. 462 U.S. at 236, 103 S.Ct. at 2331.

As for the probable cause standard:

Perhaps the central teaching of our decisions bearing on the probable-cause standard is that it is a "practical, nontechnical conception." ... "In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."

*Id.* at 231, 103 S.Ct. at 2328.

The Court went on to quote Chief Justice Marshall who, in *Locke v. United States*, 11 U.S. (7 Cranch) 339, 348, 3 L.Ed. 364 (1813) observed that "the term 'probable cause,' according to its usual acceptation, means less than evidence which would justify condemnation.... It imparts a seizure made under circumstances which warrant suspicion" and continued:

> More recently, we said that "the *quanta* ... of proof" appropriate in ordinary judicial proceedings are inapplicable to the decision to issue a warrant.... Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision. While an effort to fix some general, numerically precise degree of certainty corresponding to "probable cause" may not be helpful, it is clear that "only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause."

> \* \* \* \* \* \*

> We also have recognized that affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleading have no proper place in this area."

462 U.S. at 235, 103 S.Ct. at 2330 (citations omitted).

A critical reading of that portion of Agent Gabriel's affidavit which sets out the information supplied by the nine confidential informants in the light of the foregoing principles drives me to conclude that had his affidavit contained nothing more, the magistrate would have had a substan-

tial basis for determining that probable cause existed and his determination to issue the warrant upon that basis alone would not have been an abdication of his duty by merely ratifying "the bare conclusions of others." *Id.* at 239, 103 S.Ct. at 2333. Judge Duffy was informed of the methods by which the information supplied by the informants was corroborated. The defendants do not dispute that he was. (Def.Mem. p. 36.) Agent Gabriel's affidavit established the extent to which the information supplied by one informant was corroborated by the other informants and the extent to which the information they supplied was corroborated by subsequent events such as, for example, the extent to which Gotti would use apartment 10 at 247 Mulberry Street. A detailed analysis of that corroboration is set forth in the government's memorandum at pages 23–35 and having compared that analysis against my own, I will not repeat it beyond saying that it more than satisfies "the totality-of-the-circumstances analysis that traditionally has informed probable cause determinations." *Illinois v. Gates,* 462 U.S. at 238, 103 S.Ct. at 2332. It follows, therefore, that setting the Ravenite tapes aside, the remainder of the Gabriel affidavit, by any practical, common sense standard, is sufficient to establish probable cause. It also follows, therefore, that the second prong of *Franks* has not been satisfied by the defendants, and their request for an evidentiary hearing is denied.

II. The Attorney–Client Privilege, the Sixth Amendment and the Requirements of 18 U.S.C. §§ 2510, et seq.

Among the conversations intercepted pursuant to the September 1989 orders were several between various defendants and Gerald Shargel, who represents defendant Gravano, and Bruce Cutler, who represents defendant Gotti. The conversations challenged were intercepted on November 10, 1989, November 29, 1989, January 3, 1990, February 27, 1990, March 5, 1990, March 9, 1990 and April 18, 1990. Shargel and Cutler represented their respective clients in previous prosecutions brought by the government. The defendants assert that these conversations

should be suppressed on three grounds, each of which will be considered. They also assert that a hearing is required to resolve the issues in dispute.

### A. The Attorney–Client Privilege

■ The law places the burden on the person claiming the attorney-client privilege to establish all of its essential elements. *United States v. Schwimmer,* 892 F.2d 237, 244 (2d Cir.1989); *United States v. Kovel,* 296 F.2d 918, 923 (2d Cir.1961). Those elements are: (1) the client must seek legal advice; (2) the advice must be sought from an attorney acting in his professional capacity; (3) the communication between attorney and client must be for the purpose of seeking legal advice; and (4) the communication must be made in confidence.

■ Not every communication between an attorney and his client is privileged. It is well established, for example, that the privilege is not available when the communication is uttered in the presence of a third party whose presence serves no necessary purpose to the furtherance of the attorney-client relationship. If it is claimed that the presence of the third party is necessary, the defendant bears the burden of proving it. *See generally* J. Weinstein & M. Berger, 2 *Weinstein's Evidence* ¶ 503(a)(4)[01] at 503.29 (1990); *United States v. Landof,* 591 F.2d 36, 39 (9th Cir. 1978). The privilege is not available when the substance of the communication is disclosed to a third party by the client or with his approval or consent. *In re Horowitz,* 482 F.2d 72, 81 (2d Cir.), *cert. denied,* 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973); *In re Von Bulow,* 828 F.2d 94, 101 (2d Cir.1987). The privilege is not available if the communication was not made for the purpose of obtaining legal advice. The privilege is not available to avoid disclosure of fee arrangements as evidence of payments made by a benefactor or as evidence of otherwise unexplained wealth. *In re Grand Jury Subpoena,* 781 F.2d 238, 248 (2d Cir.1985). The privilege is also not available for communications made for the purpose of committing a crime, *United*

*States v. Loften,* 507 F.Supp. 108, 112 (S.D.N.Y.1981), regardless of whether the attorney was aware that he was being consulted for that purpose. *In re Grand Jury Proceedings,* 674 F.2d 309, 310 (4th Cir. 1982). Whether the communication was made for criminal purposes can be determined only within the context in which it was made in any given case. *Weinstein's Evidence, supra,* ¶ 503(d)(1)[01] at 503.71.

The implication inherent in the defendants' contentions, here and in opposition to the government's motion to disqualify their counsel, which they incorporate by reference in support of this motion, that it offends fundamental principles to intercept conversations in the presence of an attorney, has no merit. *See United States v. Loften, supra,* at 111. As the court had occasion to remark in *United States v. Hyde,* 574 F.2d 856, 870 (5th Cir.1978), "doctors and lawyers have been known to commit crimes."

The defendants' reliance upon *United States v. Cunningham,* 672 F.2d 1064 (2d Cir.1982) and *United States v. Castellano,* 610 F.Supp. 1137 (S.D.N.Y.1985) as validating their request for a hearing is misplaced for several reasons. To begin with, the issues raised by them in this motion are identical to the issues they raised in opposition to the government's motion to disqualify some of their lawyers. Extensive briefs were submitted and a comprehensive hearing extending over several hours was held on the disqualification motion. I have been provided with and have listened to a cassette containing all the excerpts relevant to the government's disqualification motion and have carefully examined the pertinent transcripts. A hearing ·to determine whether the intercepted conversations offended the Sixth Amendment and invaded the sanctity of the attorney-client relationship has already been held and to hold another would only be duplicative. In addition, the purposes for which the hearings were held in *Castellano* and *Cunningham* are not relevant to this motion. The court in *Castellano* sought assurance that a witness would testify that Gerald Shargel was an agent of the enterprise. In *Cunningham,* the court sought to determine the

admissibility of evidence upon which a motion to disqualify hinged. The admissibility of the intercepted conversations is the issue before me and upon which a hearing was held. If the motion to suppress is denied, such other questions as to admissibility as may arise can be resolved at trial.

■ 1. *Interception of Attorney–Client Conversations Only on Probable Cause.* The defendants urge the adoption of a rule presumptively prohibiting the interception of conversations between attorney and client absent a showing that probable cause exists to believe that such interception is warranted by an exception to the attorney-client privilege. Such a rule is required, they contend, because: (1) the interest in preserving the attorney-client privilege inviolate is greater than the governmental interest in obtaining non-privileged communications; (2) the likelihood of improperly intercepting attorney-client conversations is great because "the universe of properly interceptible conversations between attorney and client is far smaller than the universe of properly interceptible conversations between lay persons" (Def. Mem., p. 44); (3) determining which conversations are not privileged is "extraordinarily complex" due to considerations of the joint defense privilege and should not be left to the "officers in the field" (Def. Memo, pp 45–46); and (4) the government has an incentive to stretch to its limits the minimization requirement when intercepting attorney-client conversations.

The defendants represent that the "question whether government agents may listen to conversations between investigative targets and their known counsel, absent probable cause to believe an exception to the attorney-client privilege exists, has not previously been resolved in this Circuit, and its treatment elsewhere has been incomplete." (Def.Mem. at 42). This is surely not the first case in which attorney-client conversations have been electronically intercepted, nor, I am saddened to believe, will it be the last. The reported cases belie the accuracy of the defendants' representation. Urgings similar to theirs have been considered and rejected. *See, e.g., Stoddard v. United*

*States,* 710 F.2d 21, 23 (2d Cir.1983); *United States v. Hyde,* 574 F.2d 856, 870 (5th Cir.1978); *United States v. Shakur,* 560 F.Supp. 318, 326 (S.D.N.Y.1983); *United States v. Loften,* 507 F.Supp. 108, 111 (S.D.N.Y.1981); *United States v. De Palma,* 461 F.Supp. 800, 821 (S.D.N.Y.1978); *United States v. Levine,* 690 F.Supp. 1165, 1180 (E.D.N.Y.1988). In addition to the countless cases in which conversations between attorneys and clients have been intercepted and challenged unsuccessfully, it is worth noting that the statutes authorizing electronic surveillance which were enacted with a sensitive concern for constitutional rights make no special provision for privileged communications beyond requiring that the interception be minimized. *See* 18 U.S.C. § 2518(5). The absence of such a provision may bespeak a recognition by Congress that "doctors and lawyers have been known to commit crimes." *United States v. Hyde, supra.*

The "extraordinary complexity" prong of their argument is not persuasive. The court's attention has not been called to any of the many cases of intercepted attorney-client communications in which that factor was regarded as a matter of moment. Law enforcement personnel are required to make decisions constantly in areas which can fairly be described as extraordinarily complex. One need only consider the thousands of cases in which courts are called upon to decide the validity of a warrantless search and seizure and the thousands of pages written by scholars attempting to reconcile or explain those cases. The same may be said of the thousands of cases involving inculpatory custodial statements. The suggestion that warrantless searches and seizures and custodial interrogations be precluded because they involve legal questions of extraordinary complexity would not be seriously entertained. Our courts are as competent to deal with the complex issues of privilege when they arise, as they are to deal with other complex issues in the law.

The prong of the defendants' argument which would compare the breadth of the universe of interceptible conversations between attorney and client with the breadth of the universe of interceptible conversations between lay persons is equally unpersuasive. It suffices to say that the validity of a duly issued order authorizing electronic surveillance is not a matter of astronomical measurement any more than "the Fourteenth Amendment [is not an enactment of] Mr. Herbert Spenser's Social Statics." *Lochner v. New York,* 198 U.S. 45, 75, 25 S.Ct. 539, 546, 49 L.Ed. 937 (1905) (Holmes, J., dissenting).

The "balancing" prong of the defendants' argument requires no extended discussion. To entertain it would virtually confer a license to abuse the privilege. That privilege is honored best when it is zealously guarded against any effort to render it anemic in serving the purpose for which it was intended. That privilege and indeed, the entire legal profession, is honored least by zealous efforts to bend the privilege to serve purposes for which it was never intended.

The duty of the advocate was memorably expressed by Crampton, J. more than a hundred years ago, in part, as follows:

"we should not do evil that good may come of it." I would say to the Advocate upon this subject—let your zeal be as warm as your heart's blood, but let it be tempered with discretion and with self-respect; let your independence be firm, uncompromising, but let it be chastened by personal humility; let your love of liberty amount to a passion, but let it not appear to be a cloak for maliciousness. The judge then turned to the suggested doctrine that counsel was the mere mouthpiece of his client, and said

Such, I do conceive, *is not* the *office of an Advocate.* His office is a higher one. To consider him in that light is to degrade him. I would say of him as I would say of a member of the House of Commons—he is a representative, but not a delegate. He gives to his client the benefit of his learning, his talents and his judgment; but all through he never forgets what he owes to himself and to others. He will not knowingly misstate the law—he will not wilfully misstate the facts,

though it be to gain the cause for his client. He will even bear in mind that if he be the Advocate of an individual, and *retained* and remunerated (often inadequately) for his valuable services, yet he has a prior and perpetual *retainer* on behalf of truth and justice; and there is no Crown or other license which in any case, or for any party or purpose, can discharge him from that primary and paramount retainer.

*R. v. O'Connell* 7 Ir.L.R. 261, 312–13 (1844), *reprinted in Megarry, Miscellany-at-Law,* 50–51 (1955).

2. *Joint–Defense Privilege.* Another ground urged by the defendants, as a corollary to the attorney-client privilege ground in support of their motion to suppress, is the joint-defense privilege. At page 45 of their Memorandum they assert that "the 'joint-defense privilege' . . . extends the attorney-client privilege to communications 'passing from one party to the attorney for another party where a joint defense effort on strategy has been decided upon and undertaken by the parties and their respective counsel.'" The defendants would extend the application of the joint defense privilege to conversations among the defendants themselves even in the absence of any attorney during the course of those conversations. Such an extension is supported neither in law nor in logic and is rejected.

 The joint-defense or common interest rule cloaks communications with confidentiality where "a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." *United States v. Schwimmer,* 892 F.2d 237, 243 (2d Cir.1989). The burden of establishing the existence of a specific agreement to pursue a joint defense is upon the defendants. *United States v. Lopez,* 777 F.2d 543, 552 (10th Cir.1985). The defendants have not discharged that burden nor is that burden discharged by a naked assertion that one attorney represents one of a number of persons who are the targets of an electronic surveillance order. *See United States v. Loften,* 507 F.Supp. 108, 112 (S.D.N.Y.1981).

In addition, I have listened to the seven intercepted conversations which are the subject of this motion and either fail to find any basis upon which the joint-defense privilege can be raised or find that the privilege asserted as to each conversation has been waived or is embraced by one or more of the exceptions to the rule which has been discussed heretofore.

B. *Particularization and Minimization Requirements*

 The defendants contend that the orders authorizing the electronic surveillance were invalid in that they failed to particularize the category of conversations which might be privileged and therefore not subject to interception. In the course of their presentation of this contention, they assert that "[n]o mention is made of the need to minimize . . . attorney-client conversations which were likely to occur between Gotti and his lawyers, *given his general notoriety* and the intensity of the pending investigations against him." (Def. Mem. at p. 50) (emphasis mine). If, implicit in that statement is the suggestion that the more notorious the defendant the more solicitous of him must the government be, it is hereby categorically rejected. Also rejected is this ground for suppression for the reason that it would write into the statute a requirement that is not there. I have previously noted that the statute makes no special provision for privileged communications beyond requiring that interceptions be minimized. The statute provides that the authorizing order contain "a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates," 18 U.S.C. § 2518(4)(c), and that the order also "contain a provision that the authorization to intercept shall be . . . conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." 18 U.S.C. § 2518(5). The defendants would have the order particularize every communication not otherwise subject to interception, a requirement that the statute plainly does not impose. The defen-

dants have cited no authority for that proposition nor has the court been able to find any. The defendants do not dispute that the statute's commands were obeyed in that the order did contain a particular description of the type of communication that could be intercepted, the offense to which it relates and a direction that interceptions be minimized as the statute required. Their insistence that the order contain more has no merit.

The defendants also challenge the minimization instructions given to the monitoring agents by the Justice Department Attorney on the ground that those instructions did not contain a primer on the joint-defense privilege. Neither, for that matter, did those instructions contain a primer on the husband-wife or doctor-patient privilege in anticipation of the possibility that one of the defendants might be overheard communicating with either his wife or his physician in the Ravenite Social Club or in apartment 10 or at the curb of 247 Mulberry Street. In any event, their claim is that the statute was violated and it is plain that it was not. There is no statutory requirement of which I am aware as to what the instructions to the monitoring agents must contain.

### III. Availability of Other Investigatory Measures

■ 18 U.S.C. § 2518(3)(c) provides that an order authorizing electronic surveillance may be entered "if the Judge determines on the basis of the facts submitted by the applicant that normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."

The defendants contend that normal investigative procedures were available and would have succeeded if tried and that insofar as the orders relied on the representations of Agent Gabriel to the contrary, they were invalid. In support of their contention the defendants argue that the language of the Gabriel affidavit listing fourteen reasons why normal investigative procedures would not be likely to succeed is boilerplate and that virtually identical language has been used in prior affidavits

in support of applications for similar orders. The defendants also assert that in light of the fact that the confidential sources have never been subpoenaed to testify, the affiant's assertion that they would refuse to testify if they were, is untested and speculative.

The purpose § 2518(3)(c) was intended to serve has been discussed by the Court of Appeals for the Second Circuit on numerous occasions. In *United States v. Martino*, 664 F.2d 860 (2d Cir.1981) the court held, at page 868:

> [T]he purpose of these "other investigative techniques" requirements "is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing Judge of the difficulties involved in the use of conventional techniques." ... Moreover, the required showing is to "be tested in a practical and commonsense (sic) fashion." ... In short, the requirement is "simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974).

A critical analysis of Agent Gabriel's affidavit in a "common-sense and realistic fashion" and giving due deference to the determination of the authorizing judge, *United States v. Ruggiero*, 726 F.2d 913, 924 (2d Cir.) (citations omitted), *cert. denied*, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984), I conclude that the affidavit amply satisfies the requirement of the statute.

Agent Gabriel was told by the nine confidential sources that they would not testify before a grand jury even if each was granted immunity and accepted into the witness protection program. Each believed that given their knowledge of the persons their testimony would implicate, their lives and the lives of their families would be jeopardized were they to appear before the grand jury. The defendants' insistence that the dimension of their fears be tested neverthe-

less by the issuance of grand jury subpoenas is supported neither by law nor logic. The very act of compelling them to appear before a grand jury may threaten their exposure as confidential sources. In addition, there is no basis upon which to impugn Agent Gabriel's judgment, borne of years of experience investigating organized crime activity in New York, that the fears of the confidential sources are and were well founded. The judgment of the Agent that compelling the confidential informants to appear before a grand jury pursuant to a subpoena would "result in a wall of silence even at the risk of contempt accords with common experience." *United States v. Shipp*, 578 F.Supp. 980, 990 (S.D.N.Y.1984). In *United States v. Santoro*, 647 F.Supp. 153, 159 (E.D.N.Y.1986), the court responded to a similar contention thus: "I do not believe Congress intended that the government be required to prosecute victims and marginal actors in a criminal enterprise before being permitted to use electronic surveillance to gather evidence against those it believes to be the main wrongdoers. The government need not show that it has exhausted every conceivable avenue of investigation."

Agent Gabriel also swore that the confidential sources were incapable of infiltrating "the inner circles of the highest echelon of the Gambino crime family in order to fully discover the particulars of that group's illegal activities. Nor do these sources, either individually or collectively, have access to all meetings concerning the Gambino family enterprise conducted by John Gotti" in or near 247 Mulberry Street, New York. His affidavit stated that physical surveillance confirmed that John Gotti met frequently in or near 247 Mulberry Street with members and associates of the Gambino family, but that the surveillance alone cannot provide sufficient evidence of each element of the crimes which there is probable cause to believe the defendants have committed and are committing. Agent Gabriel detailed twelve other reasons to support his belief that normal investigative techniques will not succeed if tried and are too dangerous to undertake.

These include a consideration of the futility of interviewing gamblers who participated in Gambino family gambling businesses; the futility of attempting to enlist the aid of loanshark victims of the Gambino family; the then inability to identify the persons involved in illegal labor payoffs and the likelihood that they would refuse to testify unless they were apprehended in the commission of the illegal act; the secrecy in which conspiracies to murder and obstruct justice are generally shrouded; the limited value of pen register data; the futility, for cogent reasons stated, of search warrants; the unlikelihood that the utilization of the investigative grand jury would prove fruitful, based upon past experience with efforts to conceal and destroy evidence a grand jury would seek; the readiness with which knowledgeable witnesses will suffer imprisonment for contempt rather than testify which experience has also taught; and the danger inherent in an attempt to infiltrate this closely-knit top echelon of targets of the investigation with undercover agents and the likelihood that such attempts will fail.

The expedient of alternative pleading being carried too far is further demonstrated by the defendants' contention that this portion of Agent Gabriel's affidavit is boilerplate, and almost precisely similar in content to many other electronic surveillance affidavits. They decry the lack of originality and lack of creativity in the draftsmanship of this portion of the affidavit and decry the creativity of the writing in that portion of the affidavit explicating probable cause. Judge Weinfeld aptly characterized challenges to the "normal investigative procedures" portion of an affidavit which mirrored these by observing that: "Their Monday morning quarterbacking as to what investigative techniques the agents should have employed in addition to what they did employ is utterly unrealistic if not naive." *United State v. Shipp, supra*, at 989. *See also United States v. Puglisi*, 790 F.2d 240 (2d Cir.), *cert. denied*, 479 U.S. 827, 107 S.Ct. 106, 93 L.Ed.2d 55 (1986); *United States v. Terry*, 702 F.2d 299, 310 (2d Cir.), *cert. denied*, 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983); *United States v.*

*Fury,* 554 F.2d 522, 530–31 (2d Cir.), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977); *United States v. Martino,* 664 F.2d 860, 868 (2d Cir.1981).

### IV. Failure To Deactivate "Bug" Permanently Pursuant To Prior Order

▉ The defendants contend that evidence obtained from interceptions pursuant to the September 25, 1989 order and its extensions must be suppressed because the government had established monitoring capability prior to the issuance of that order. This assertion is predicated upon the law of New York State which they urge should be incorporated into the federal law. More specifically, New York Criminal Procedure Law § 700.35(2) provides that:

> Upon termination of the authorization ... eavesdropping or video surveillance must cease and as soon as practicable thereafter any device installed for such purpose either must be removed or must be permanently inactivated....

The defendants do not dispute that there is no comparable requirement in the federal statutes regulating electronic surveillance. The electronic surveillance at issue here was authorized pursuant to federal, not state statute.

The defendants cite no authority for the proposition that the state statutory requirements should be read into the federal statutes nor has the court's research uncovered any. Instead, the defendants relegate to a footnote a discussion of cases in which they suggest that the Court of Appeals for this Circuit held that the more stringent state statute should be applied in federal courts interpreting the lawfulness of a state-ordered surveillance order, at least where the state law is "designed to protect an individual's right of privacy." *United States v. Aiello,* 771 F.2d 621, 627 (2d Cir.1985). The other cases cited in the footnote all concerned warrants issued pursuant to state statute by a state court. The defendants recognize that whatever significance the quoted language from *Aiello* might have had, *United States v. Rowell,* 903 F.2d 899, 901 (2d Cir.1990) left no doubt that federal law should apply to federal

prosecutions in determining the admissibility of evidence obtained under a state-issued wiretap order. They also cited *United States v. Combs,* 672 F.2d 574, 578 (6th Cir.), *cert. denied,* 458 U.S. 1111, 102 S.Ct. 3495, 73 L.Ed.2d 1374 (1982) for the proposition that states cannot impose requirements on federal courts that are more strict than those already required by federal law. The effort to buttress their contention by analogy to sealing requirements is not persuasive.

### V. Interception When No Targets Were On The Premises

The order of September 25, 1989 directed that the interceptions be discontinued if it could be determined that none of the following individuals was within the premises described: John Gotti, Jack D'Amico, Frank Locascio, Salvatore Gravano and any of their accomplices, aiders or abettors. The defendants claim that approximately 245 out of a total of 7,053 interceptions did not comply with the order and for that reason all the interceptions should be suppressed. The defendants rely on *United States v. Focarile,* 340 F.Supp. 1033, 1047 (D.Md.), *aff'd sub nom. United States v. Giordano,* 469 F.2d 522 (4th Cir.1972), *aff'd,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), in urging that total suppression is appropriate where the requirements of the statute are flagrantly disregarded. Assuming that the explicit terms of the court's order were violated, which the government disputes, it would not follow that a total of approximately three and one-half percent of impermissible interceptions can be characterized as *flagrant* disregard of the court's order. A "blind reliance on the percentage of nonpertinent calls intercepted is not a sure guide to the correct answer." *Scott v. United States,* 436 U.S. 128, 140, 98 S.Ct. 1717, 1724, 56 L.Ed.2d 168 (1978). However, this is not the only reason why the defendants' challenge must fail.

#### A. *Standing*

▉ The government contends that, in any event, the defendants lack standing to challenge a minimization departure, rely-

ing on *United States v. Burford,* 755 F.Supp. 607 (S.D.N.Y.1991) and cases cited therein for the well-settled law in this Circuit "that to have standing to challenge improper minimization during a wiretap executed by the government, ... a defendant must show a direct privacy interest." Injury to a privacy interest is established by proving a possessory or proprietary interest in the premises on which the interception occurs. *See United States v. Fury,* 554 F.2d 522, 526 (2d Cir.), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977); *United States v. Hinton,* 543 F.2d 1002, 1011 n. 13 (2d Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976). This principle is familiar to defendant Gotti, at least, who was held to have lacked standing to challenge the validity of intercepted communications at the residence of Angelo Ruggiero. *See United States v. Dellacroce,* 625 F.Supp. 1387, 1393 (E.D.N.Y.1986).

The defendants recognize the necessity of standing as a condition precedent to a minimization challenge. At page 80 of their Memorandum they state:

> We recognize, however, that cases such as *United States v. Gallo,* 863 F.2d 183 [185] (2d Cir.1988) and *United States v. (Gene) Gotti,* 928 F.2d 1289, 1991 W.L. § 7625 (2d Cir. March 22, 1991) appear to limit standing to those whose premises or phones were targeted for surveillance, *even to the exclusion of others who were targets of the surveillance order.* (Emphasis added).

Their recognition of the standing limitation is a crabbed one inasmuch as they assert that the cases cited were wrongly decided, as is also their view of *United States v. Rowell, supra.* Notwithstanding their appraisal of the correctness of the holdings of the Court of Appeals, I am obliged to obey the teachings of that court and will do so.

The defendants offer no basis for permitting a finding that they have standing. Surely, they can claim no privacy, possessory or proprietary interest in the sidewalk or bed of the street in front of 247 Mulberry Street. An asserted claim to a privacy, possessory or proprietary interest in the common hallway at 247 Mulberry Street would be equally specious. And just as the defendants had no privacy, proprietary or possessory interest in the residence of Angelo Ruggiero, so too have they failed to establish that they have such interest in apartment 10 at 247 Mulberry Street. The defendants similarly offer no basis for permitting a finding that they have the requisite privacy, possessory or proprietary interests in the Ravenite Social Club to confer standing beyond stating that it is a private club which the defendants frequented. Absent is any statement revealing the legal status of the entity known as the Ravenite Social Club—is it a partnership; unincorporated association; corporation? Who are the members, partners, shareholders or owners of that club and by virtue of what legally cognizable arrangement does it rightfully occupy the premises? *People v. Gotti,* No. 358/89 at 4.7 (N.Y.Sup.Ct. November 22, 1989) held that Gotti lacked standing to challenge minimization of intercepted conversations at the Bergen Hunt and Fish Club. For the reasons stated, I believe that determination was correct and reach the same conclusion.

## B. *Spot–Checking and Monitoring*

■ In addition to the failure to satisfy the condition precedent of standing as a ground upon which the defendants' minimization challenge must be rejected, their assault upon the validity of the interceptions must fail because the interceptions did not violate Judge Duffy's order. The direction contained in Judge Duffy's order is, in relevant part, as follows:

> IT IS FURTHER ORDERED THAT *if it can be determined that* neither JOHN GOTTI, JACK D'AMICO, FRANK LOCASCIO, SALVATORE GRAVANO, *nor any person who is subsequently identified as an accomplice, aider, abettor or other participant in the above-designated offenses* is within the above-described premises or at the locations subject to this order, the interception of oral communications shall be discontinued, except that if such a determination is made and monitoring is discontinued and agents are thereafter unable to determine

whether any of the aforementioned persons is within the premises or at the locations subject to this order, *oral communications may be spot monitored to determine if the conversations concern the illegal activity, in which event they may be intercepted.* If the conversations involve the named subjects, they may be intercepted until such time that the monitors can determine that the conversations do not concern the designated illegal activity and that such non-pertinent communication appears likely to continue for a period of time. (Emphasis added).

The language of that order does not support a construction that would prohibit outright the interception of conversations when the named targets were not present. The precise direction was that interception shall be discontinued *"if it can be determined"* that targets were absent. Such a determination cannot be made without monitoring conversations which, logic would dictate, was implicitly authorized for that purpose. Such monitoring or spot-checking to permit the making of the required determination violates neither the statute nor the Fourth Amendment. *Scott v. United States*, 436 U.S. 128, 140–43, 98 S.Ct. 1717, 1724–26, 56 L.Ed.2d 168 (1978); *United States v. Hinton*, 543 F.2d 1002, 1012 (2d Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1977). Neither the statute nor judicial gloss on it prescribes a time limit beyond which spot monitoring may not last. Nor would such a time limit be feasible. Reasonableness is the touchstone by which to be guided. *Scott v. United States*, 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978) insightfully recognized that that must be so:

In determining whether the agents properly minimized it is also important to consider the circumstances of the wiretap. For example, when the investigation is focusing on what is thought to be a widespread conspiracy more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise.

436 U.S. at 140, 98 S.Ct. at 1725.

In discussing the many factors that may properly be considered in determining whether interceptions were properly minimized, the Court noted:

Other factors may also play a significant part in a particular case. For example, it may be important to determine at exactly what point during the authorized period the interception was made. During the early stages of surveillance the agents may be forced to intercept all calls to establish categories of nonpertinent calls which will not be intercepted thereafter.... Other situations may arise where patterns of nonpertinent calls do not appear. In these circumstances it may not be unreasonable to intercept almost every short conversation because the determination of relevancy cannot be made before the call is completed.

... In a case such as this, involving a wide ranging conspiracy with a large number of participants, even a seasoned listener would have been hard pressed to determine with any precision the relevancy of many of the calls before they were completed.

436 U.S. at 141–42, 98 S.Ct. at 1725 (footnote omitted). *See also United States v. Willis*, 890 F.2d 1099, 1101–03 (10th Cir. 1989); *United States v. Hinton, supra,* at 1012; *United States v. Lilla*, 534 F.Supp. 1247, 1267–68 (N.D.N.Y.1982).

The language of the order does not support a construction that the targets were the only four persons named. It plainly authorized the interception of "any person who is subsequently identified as an accomplice, aider, abettor, or other participant in the above-described offenses." The widespread, far-reaching criminal enterprise which was the focus of this investigation provides sufficient justification for more extensive surveillance and for the interception of communications by individuals as yet unknown and whose names could not have been included in the order. *See Scott v. United States*, 436 U.S. at 140, 98 S.Ct. at 1724 (1978); *United States v. Figueroa*, 757 F.2d 466, 470–71 (2d Cir.), *cert. denied*, 474 U.S. 840, 106 S.Ct. 122, 88 L.Ed.2d 100 (1985). For all of the foregoing reasons,

the challenge to the minimization requirement must fail.

## VI. The Electronic Surveillance At The Bergen Hunt & Fish Club Inn 1985–86 And Leads Obtained Therefrom

In 1985 and 1986, electronic surveillance was conducted at the Bergen Hunt & Fish Club by the New York State Organized Crime Task Force (OCTF). The defendants move to suppress those interceptions on five grounds: (1) the authorizing orders were not based on probable cause; (2) normal investigative techniques were not exhausted prior to issuance of order; (3) the deputy attorney general directing OCTF was not authorized to apply for the orders; (4) there was a failure to notify the issuing court of prior electronic surveillance; and (5) minimization requirements were violated.

The defendants candidly advised the court at the outset of this case that the substance of this motion was extensively litigated in *People v. Gotti*, (Sup.Ct., N.Y. County, Ind. No. 318/89). The motion was denied by that court. The motions are presented here upon the assertion that the issues raised in the state court have not been passed upon by a federal court. The memoranda submitted in the state court are incorporated by reference.

For the reasons that follow, this motion is denied:

1. *Probable Cause.* The state court argument relies upon the legal standard known as the *Aguilar–Spinelli* test which was rejected in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) and which would not be applicable in a federal court, as was held in *United States v. Rowell*, 903 F.2d 899 (2d Cir.1990), previously discussed.

2. *Alternative Investigative Techniques.* The reasons assigned for rejecting the defendants' challenge to the September 25, 1989 order on this ground and which were discussed above are equally applicable for the rejection of this motion.

3. *The Authority of the Deputy Attorney General.* The defendants' claim has been declared to be without merit in *United States v. Vario*, 88–CR–719 (JM) (E.D.N.Y. May 3, 1989) and in *People v. Vespucci*, 75 N.Y.2d 434, 554 N.Y.S.2d 417, 553 N.E.2d 965, *cert. denied*, — U.S. —, 111 S.Ct. 52, 112 L.Ed.2d 28 (1990).

4. *The Failure to List All Prior Surveillances.* The defendants urge that the affidavits in support of an application to the state court failed to identify every occasion on which John Gotti and Angelo Ruggiero were named as intercept targets in prior orders for electronic surveillance. An affidavit submitted by Patrick J. Cotter, an Assistant United States Attorney, in opposition to this motion, reflects that a hearing extending over three days was held in the state court on this issue. (Cotter Aff., Exh. C at 5.) That affidavit also reflects that the evidence at that hearing established that OCTF did not know that Gotti and Ruggiero were named as interceptees in prior orders for electronic surveillance. (Cotter Aff., Exh. C at 7–10.) The record of that prior hearing may properly be relied on as a sufficient basis for deciding that this claim of the defendants has no merit. *See United States v. Squitieri*, 688 F.Supp. 163 (D.N.J.1988), *aff'd*, 879 F.2d 859 (3rd Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 366, 107 L.Ed.2d 352 (1989). An examination of the Cotter Affidavit also reveals that in a prior proceeding in this district, Judge Weinstein rejected a motion to quash a subpoena which relied on the same state proceedings as are relied upon here. *See* Transcript of Proceedings, November 15, 1989, *United States v. Gambino*, 89–CR–431 (JBW). (Gov't. Mem. at 72–73.)

5. *The Minimization Challenge.* The minimization challenge was rejected by the state court and is similarly rejected here.

For all the foregoing reasons the defendants' motion to suppress evidence obtained from the electronic surveillance is hereby denied in its entirety.

SO ORDERED.